UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert Augustine D'ANJOU, a/k/a Dennis Dennison, Defendant–Appellant.

No. 93–5020.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1993.

Decided Feb. 16, 1994.

---

**ARGUED:** Edward A. Fiorella, Jr., Harkey, Fletcher, Lambeth, Nystrom & Fiorella, Charlotte, North Carolina, for Appellant. Robert James Conrad, Jr., Assistant United States Attorney, Charlotte, North Carolina, for appellee. **ON BRIEF:** Jerry W. Miller, United States Attorney, Charlotte, North Carolina, for appellee.

Before ERVIN, Chief Judge, RUSSELL, Circuit Judge, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

Robert D'Anjou was charged with narcotics and firearms violations in two counts of a twenty-seven count indictment returned July 11, 1991.[1] Immediately prior to trial, the firearms count was dismissed on motion of the United States, and D'Anjou was tried and convicted on the remaining count. He subsequently was sentenced to life imprisonment pursuant to the federal sentencing guidelines, and now appeals numerous issues relating to his arrest, trial and sentencing. We affirm.

I

The facts underlying the indictment and conviction need only be briefly sketched. Brian Mahon, a Guyanese national, arrived in the United States in 1985 and took up residence in New York. In 1989, Mahon began selling drugs. He estimates that between 1989 and 1990, he sold approximately four kilograms of crack cocaine in New York. Because the police began to crack down on the drug dealing in his neighborhood, however, in October 1990 Mahon decided to relocate from Brooklyn, New York, to Charlotte, North Carolina. His girlfriend, Telisha Watkins, preceded him to Charlotte, and upon his arrival she introduced him to several people in Charlotte involved in the drug trade. Mahon and Watkins set up their drug business along North Tryon street, but in November relocated to the Consort Inn. Although another drug dealer, Johnny Todd, already was established at the Consort Inn, Mahon entered into agreements with him and the owner to allow Mahon to use the Inn as his base.

To operate his drug ring, Mahon relied largely on fellow Guyanese nationals with whom he had worked in Brooklyn. Mahon brought down two people from New York in November, and later, around New Year's, he brought down D'Anjou. D'Anjou knew that Mahon had moved to Charlotte, and he asked

---

1. D'Anjou was charged with conspiring to possess with intent to distribute and with distributing in excess of 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846, and with knowingly using and carrying a firearm in connection with this crime in violation of 18 U.S.C. § 924(c)(1). The indictment was superseded by a second indictment on August 8, 1991, that provided more detail regarding actual names of various individuals but that did not affect the substance of the violations charged.

Mahon approximately three times between October and December to bring him down so he could work with him. Once Mahon felt that he had established some stability in Charlotte, he told D'Anjou that he could come down and help distribute the drugs and collect the money. D'Anjou then moved to Charlotte, bringing some quantity of crack with him from New York.

Upon his arrival in Charlotte, D'Anjou moved in with Mahon and Watkins in an apartment on Miriam Avenue and joined them in coordinating the drug distribution enterprise. Mahon set up two "stash houses" (central repositories for guns, drugs and money) on Miriam Avenue and at Countryside Apartments that provided more safety and quiet and involved less traffic than the rented rooms at the Consort Inn. D'Anjou lived at both locations over the next six months and was principally responsible for managing them. D'Anjou assisted in cutting and bagging the crack into retail quantities. He and Watkins also assisted Mahon in supplying the dealers at the Consort Inn, which involved giving them new quantities while they gave D'Anjou the money earned on the completed sales. Sometime during the spring, Mahon sent D'Anjou to New York to pick up a resupply of drugs, and D'Anjou returned with five ounces of crack.

On May 29, 1991, the United States Postal Service interdicted a package of drugs that had been sent from New York to the stash house on Miriam Avenue. After it was delivered to the apartment, the police arrested Watkins, who received the package. Now cooperating with the arresting authorities, Watkins called Mahon's beeper number, and he arrived and took the package from her and was also arrested. D'Anjou was not present at the time of the arrest and the police were unaware of Mahon's ring at the Consort Inn or of D'Anjou's involvement in it.

Following Mahon's arrest and confinement, the drug ring at the Consort Inn continued operating. Mahon hoped to be released on bond, and spoke with both Watkins and D'Anjou on the phone to determine the status of the operation. In his conversation with Watkins he learned that a number of his people continued to sell for him, first depleting the supply of crack on hand at the time of Mahon's arrest and then receiving supplies from John Clinton Chase ("Rossi"), who originally had been Mahon's New York supplier until it became too "hot" in New York, at which time Mahon had brought him down to Charlotte and Rossi set up a sister organization at the Consort Inn.

Within a short period of time, however, Mahon's organization began to come apart in the absence of its leader. On June 12, 1991, a fight erupted between the Mahon/Rossi ring and the other group of dealers at the Consort Inn, led by Johnny Todd. Todd himself was shot in the hip during this incident. D'Anjou was present at the scene, although the testimony regarding his involvement in the shooting is conflicting. Mahon testified at trial that D'Anjou told him in their telephone conversation that he was present and that he was armed. Following the shooting, Rossi and D'Anjou left before the police arrived. The following day, police investigators discovered weapons in the vents of rooms at the Consort Inn, and three of Mahon's men were arrested on weapons and drug charges. As various members of Todd's and Mahon's rings were arrested and began to cooperate, the rings disintegrated. D'Anjou was arrested on July 10, 1991. The procedural battles that form the heart of this case began immediately thereafter.

II

D'Anjou raises two issues on appeal relating to events that occurred prior to trial. First, he argues that he was improperly interrogated in violation of his constitutional rights and that the admission of his statement was thus reversible error; alternatively, he argues that this evidence was admitted in violation of the Federal Rules of Evidence. Second, he argues that the district court improperly refused his request to compel the government to disclose the identity of certain confidential informants. We find these two contentions to be without merit for the reasons that follow.

## A

At the time of his arrest, D'Anjou was taken to the Charlotte Police Department for booking. He was interviewed there by Edward Brigham, a special agent for the United States Immigration and Naturalization Service assigned to investigate administrative and criminal violations of the Immigration and Nationality Act, with specific regard to the actions of criminal organizations involving aliens and narcotics. Brigham began the interview with D'Anjou by requesting standard background information concerning D'Anjou's name, citizenship, place of birth, address, and length of time in Charlotte. D'Anjou provided false information to each of these questions. Following this initial questioning, Brigham read D'Anjou his *Miranda* rights, and D'Anjou claimed his right to remain silent. The interview ceased.

■ D'Anjou now argues that this questioning violated his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination and the prophylactic procedural shield of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He claims that his answers should have been suppressed. Under the Sixth Amendment,

> absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches.

*Moran v. Burbine,* 475 U.S. 412, 428, 106 S.Ct. 1135, 1144, 89 L.Ed.2d 410 (1986). However, just as with the defendant in *Burbine,* D'Anjou's claim fails because this questioning occurred prior to the point at which the Sixth Amendment right attached. In both instances, the questioning occurred immediately subsequent to the defendant's arrest and prior to arraignment. Because the underlying purpose of the Sixth Amendment right to counsel is to assure that the criminal defendant is not forced to face " 'the prosecutorial forces of organized society' " alone, *id.* at 430, 106 S.Ct. at 1145 (quoting *Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985)), the right attaches as the process shifts from investigation to prosecution, and not before.

■ The *Miranda* challenge is more difficult, and presents an issue of first impression in this circuit. The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established a series of prophylactic rules that apply to all custodial interrogation as a way of combating the inherently coercive effects of such a setting upon a person's ability to claim this constitutional right. However, before the *Miranda* rights attach, there must be custodial interrogation.

■ The issue here is whether the INS and ATF questioning constituted interrogation for *Miranda* purposes. As a general rule, interrogation has been defined for this purpose as express questioning or its functional equivalent, which includes

> "any words or actions on the part of the police (*other than those normally attendant to arrest and custody* ) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

*Pennsylvania v. Muniz,* 496 U.S. 582, 600–01, 110 S.Ct. 2638, 2649, 110 L.Ed.2d 528 (1990) (plurality opinion) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)) (emphasis supplied). As indicated by the emphasized language, there exists an exception to *Miranda*'s coverage for routine booking questions securing "biographical data necessary to complete booking or pretrial services," *Muniz,* 496 U.S. at 601, 110 S.Ct. at 2649 (plurality opinion), although this exception does not apply to questions, even during booking, that are designed to elicit incriminatory admissions. *Id.* at 602 n. 14, 110 S.Ct. at 2650 n. 14.

D'Anjou cites to authority in other circuits, primarily the Ninth, that has elaborated upon the booking exception and held that, in certain instances, questioning regarding identity, address or other routine background matters may both be anticipated to provide incriminating evidence and in fact do so, and that such questioning gains no shelter

from the booking exception. *United States v. Henley,* 984 F.2d 1040 (9th Cir.1993); *United States v. Gonzalez–Sandoval,* 894 F.2d 1043 (9th Cir.1990); *United States v. Disla,* 805 F.2d 1340 (9th Cir.1986). We do not reach the question of whether we should adopt this judicial gloss to the booking exception because we do not believe that the facts presented would support its application in this case.

■ D'Anjou's arguments center on Brigham's questioning regarding his nationality and his address. In this instance, D'Anjou was a legal resident alien, and there was no incriminatory element of the questioning until D'Anjou began supplying false information regarding his citizenship and place of birth. Because the incriminatory element was created by D'Anjou himself through his non-truthful responses, this case is unlike those in which a truthful response would in fact be incriminating and where the justification for an exception would be more persuasive. In addition, although D'Anjou gave as his address one of the stash houses, there is no evidence in the record disclosing that it was believed at the time to be a stash house or that the police anticipated that the question regarding D'Anjou's address would be incriminating. Because these facts are not ones that would require a different result even under the Ninth Circuit's approach, we affirm.

■ D'Anjou argues further that the admission of Agent Brigham's testimony concerning D'Anjou's false statements violated Federal Rules of Evidence 608(b) and 403. Federal Rule of Evidence 608(b) governs the admissibility of specific instances of conduct for the purpose of attacking or supporting a witness' credibility. D'Anjou never took the witness stand, and Brigham was the first witness for the government. Rule 608 thus does not govern this matter. Federal Rule of Evidence 403 allows the admission of relevant evidence unless its prejudicial effect substantially outweighs its probative value. The United States argues that D'Anjou's lying is probative of consciousness of guilt; certainly, it does seem to be somewhat probative that when caught in the net, he tried to slip through its strands. We do not believe that the prejudicial value is so great as to compel us to say the trial judge abused his discretion in admitting this evidence.

**B**

David Booth, a special agent for the Bureau of Alcohol, Tobacco and Firearms, swore out the affidavit upon which the criminal complaint against D'Anjou (among numerous others) was based. The affidavit referred to two confidential informants as C–1 and C–2. It also referred to "other informants," and when read in context it is clear that C–1 and C–2 were not the only informants involved in the investigation. Thus, paragraph 20 begins "Two of the confidential informants mentioned herein, C–1 and C–2, have provided...." The next sentence begins "Other informants mentioned have provided...."

■ D'Anjou moved prior to trial to compel disclosure of the identities of C–1 and C–2. On April 16, 1992, Magistrate Judge Taylor held a hearing on the motion to compel. The government indicated it did not anticipate calling C–1 or C–2 at trial, and Booth testified that these two informants did not provide any information concerning D'Anjou, and that disclosure of their identities would jeopardize active investigations. The motion to compel was denied. D'Anjou now argues that the trial court erred in not ordering the government to disclose the identity of confidential informants C–1 and C–2. This question is reviewed for abuse of discretion. *United States v. Blevins,* 960 F.2d 1252 (4th Cir.1992).

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court adopted a balancing approach to the question of identification of confidential informants that "depend[s] on the particular circumstances of each case, taking into consideration the crimes charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. at 628. In *Blevins,* we found the other factors to include the scope of the informant's role in the specific investigation. 960 F.2d at 1258. We also stated that "the burden is on the defendant

to establish that the *Roviaro* criteria in a particular case counsel in favor of disclosure." *Id.* Indeed, the defendant must come forward with " 'something more than speculation.' " *Id.* at 1259 (quoting *United States v. Smith,* 780 F.2d 1102, 1108 (4th Cir.1985) (en banc)).

The district court denied the motion in this instance, relying on the sworn testimony of ATF Agent Booth that C–1 and C–2 had not provided information regarding D'Anjou and that they were actively engaged in a current operation that would be jeopardized by the revelation of their identities. D'Anjou did not come forward with a specific need for this information. The court did not abuse its discretion in refusing to compel disclosure of these informants.

■ Defense counsel further argues that it was only at trial that he realized that there were confidential informants other than C–1 and C–2 and states that the court erred in not requiring the government to disclose the identities of those other informants. As a preliminary matter, the burden lay with the defense to demonstrate the need for the discovery of identities of confidential informants; it certainly made no such showing in this case since, if he is to be believed, defense counsel misread the affidavit and did not understand that more than two confidential informants were relied upon. This being the case, he could not have made a showing for the disclosure of informants of whom he was unaware, and the court did not err in not compelling the government to reveal their identities.

### III

D'Anjou further raises numerous issues regarding procedural matters attendant to his trial. We affirm as to each.

### A

■ D'Anjou argues that his defense was impaired when the district court refused to allow the admission into evidence of twelve statements that ATF Agent Booth had taken during his investigation that failed to mention D'Anjou in connection with the drug ring at the Consort Inn. D'Anjou's counsel did not attempt to subpoena these witnesses to testify at trial; he merely desired to bring in their statements by calling Booth to the stand. He argues that they should have been admitted under Federal Rule of Evidence 803(8)(C). As an evidentiary question, the standard of review is abuse of discretion. *United States v. Gravely,* 840 F.2d 1156, 1162 (4th Cir.1988).

■ Federal Rule of Evidence 803(8)(C) allows the admission into evidence in civil actions and proceedings, and against the government in criminal cases, of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The theory behind Rule 803 generally, which allows admission of certain categories of evidence, even though technically hearsay and even though the declarant may be available, is that "under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at trial." Original Advisory Committee Notes to Rule 803, *reprinted in* 4 Weinstein & Berger, *Weinstein's Evidence* at 803–32. In the particular case of exception 803(8), the "[j]ustification for the exception is the assumption that a public official will perform his duty properly." *Id.*

It is beyond peradventure that the authors of the Rule did not intend it to apply in this situation. The raw interview transcripts that D'Anjou desired to introduce here cannot be considered "factual findings," since they are not findings resulting from any type of evaluative process whatsoever. In addition, these transcripts have none of the indicia of reliability or trustworthiness that are the foundation for this exception to the hearsay rule. These are interview transcripts made during a police investigation of a crack ring, with none of the guarantees of truthfulness that trial or deposition testimony would disclose. Finally, they were intended to be introduced not to reveal their *content* but rather their *lack of content,* i.e., the absence of any mention of D'Anjou during these interviews. But in this instance, 20 individuals were indicted as a result of this investigation, and there is

no reason to believe that every person questioned during the investigation was asked about each of the indicted individuals. Thus, the absence of any mention of D'Anjou is not surprising. But more importantly, there is no reason to believe that the absence of such mention is itself a "factual finding" or that the fact of the absence is sufficiently trustworthy to allow this evidence to be admitted. The district court was entirely proper in keeping this evidence from the jury.

### B

▓ D'Anjou argues that his right to an impartial jury was denied when a copy of the *Charlotte Observer* containing an article on page 2C concerning the defendant's trial[2] was discovered in the jury room. The government argues that the defense did not preserve this issue for appeal, and that the standard for review is plain error. At trial, the court told the jury that a newspaper had been found in the jury room containing an article about the trial, and inquired as to whether any of them read the article. None responded. The judge responded "excellent. All right. You may proceed...." Defense counsel said nothing further, and did not request an individual poll of the jury, which is what it asks this court to require now. We agree that defense counsel did not preserve the issue and that the plain error standard applies.

▓ In the case of in-trial publicity, we have held that

> when highly prejudicial information may have been exposed to the jury, the court must ascertain the extent and effect of the infection, and thereafter, in its sound discretion, take appropriate measures to assure a fair trial.

*United States v. Hankish,* 502 F.2d 71, 77 (4th Cir.1974). In carrying out this task, the court should inquire of the jury whether any jurors have read or heard the prejudicial material, and if any has, that juror should be examined individually and outside the presence of the other jurors. " 'However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further.' " *United States v. Jones,* 542 F.2d 186, 194 (4th Cir. 1976) (quoting *Margoles v. United States,* 407 F.2d 727, 735 (7th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969)).

▓ At D'Anjou's trial, the judge proceeded in accordance with these rules by asking the jury collectively whether any had read the article; since none had, he did not proceed to an individualized questioning. While D'Anjou urges upon us a more stringent rule requiring a poll of each individual juror in such circumstances, the rules laid out in *Hankish* and *Jones* are binding precedent on this panel. *United States v. Guglielmi,* 819 F.2d 451, 457 (4th Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988). Even if they were not, we do not believe an individual poll is necessary after a general poll has been conducted and turned up no evidence of taint. It certainly was not plain error for the court not to conduct such a proceeding in this instance, especially where the article in question contained information that is, at worst, only marginally prejudicial to D'Anjou's case.

### C

D'Anjou further argues that the district court denied him a fair and impartial trial by admitting into evidence weapons used by him and other members of Mahon's ring; by limiting his cross examination of government witness Raymond Templeton; and by not adequately enforcing its order sequestering

---

**2.** The bulk of the article reported on the opening statements of the prosecutor and defense attorney the previous day. Defense counsel has not indicated the portions of the article he finds objectionable, and we see nothing that we find overly prejudicial to D'Anjou's defense. In addition to recounting the opening statements, the article contained two other pieces of information. First, it indicated that a co-defendant, Rossi, pleaded guilty prior to the commencement of trial. Given the overwhelming number of members of the Mahon and Todd rings who testified against D'Anjou and disclosed their plea agreements, this fact in itself does not appear highly prejudicial. Second, it indicated that D'Anjou could be sentenced to life imprisonment if convicted. Again, given the nature of the trial itself and the opening statements reflecting the gravity of D'Anjou's offense, this information does not appear to us to be unduly prejudicial.

all government witnesses. We have reviewed the facts contained in the joint appendix and the briefs on appeal, and we believe that D'Anjou's appeal on these points is without merit. We therefore affirm as to each.

## IV

Finally, D'Anjou raises a series of issues relating to the constitutionality of United States Sentencing Guideline § 2D1.1, the constitutionality of the sentence in his particular case, and the adequacy of the findings used to determine his sentence. We affirm.

### A

United States Sentencing Guideline § 2D1.1(c) establishes base offense levels for sentencing purposes predicated on the amount of controlled substance, by weight, involved in the offense. Under this schedule, 1 unit of crack is equated with 100 units of powder cocaine. Because crack convictions are overwhelmingly obtained against African–Americans,[3] D'Anjou contends that the law violates the equal protection component of the Fifth Amendment on the basis of its racial disparity.

Recognizing the inevitable nature of the line-drawing and differing treatment that comes from government action, equal protection challenges are generally subject to the relaxed scrutiny of rational basis review. Only if a fundamental right or a protected class is implicated are the more stringent strict or intermediate scrutiny standards applied. Here, D'Anjou concedes that the law does not discriminate on its face. Although even a facially neutral statute can be found discriminatory in its application, *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), absent such evidence a facially neutral statute is not subjected to heightened scrutiny unless the challenging party presents sufficient evidence that an impermissible discriminatory purpose can be ascribed to the enacting body. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

In this instance, there is evidence that the line Congress and the Sentencing Commission have drawn has a disproportionate impact upon blacks. But this is not sufficient to make out an Equal Protection Violation. "Standing alone, it does not trigger the rule." *Id.* at 242, 96 S.Ct. at 2048. And here, there is no argument of discriminatory application of the law that raises *Yick Wo* concerns, nor evidence advanced that a discriminatory purpose entered the hearts of those who enacted the guideline provisions. Indeed, defense counsel conceded at the sentencing hearing before the district court that he did not think Congress anticipated the statistical results that have developed. Absent such a showing, the statute is examined under the rational basis test, which it satisfies. *United States v. Thomas*, 900 F.2d 37 (4th Cir.1990). Every federal appellate court to consider the equal protection challenge under the racial disparity theory has agreed with this conclusion. *United States v. Frazier*, 981 F.2d 92 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1661, 123 L.Ed.2d 279 (1993), *and cert. denied,* —— U.S. ——, 113 S.Ct. 1662, 123 L.Ed.2d 281 (1993); *United States v. Watson,* 953 F.2d 895 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992).

### B

D'Anjou argues that the sentence of life without parole is disproportionate to the crime committed. He argues further that a life sentence constitutes cruel and unusual punishment.

In *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983), the Supreme Court held that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." In *United States v. Rhodes,* 779 F.2d 1019 (4th Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), this court ruled that, outside the capital sentencing context, an extensive proportionality analysis is required only in those cases involving life

---

**3.** The district court received information from the Sentencing Commission that 92.6% of crack defendants are black and only 4.7% are white, while 29.7% of cocaine defendants are black and 45.2% are white.

sentences without parole. Since this is one such case, proportionality review is appropriate.

In *Solem*, the Supreme Court established a series of factors to be considered in determining whether a sentence is proportional to the crime committed. 463 U.S. at 290–92, 103 S.Ct. at 3009–10. The first inquiry is to the gravity of the offense and the harshness of the penalty. Second, the court may look to the punishments meted out for other crimes within the jurisdiction, to determine whether the instant conduct is treated similarly to other crimes of similar gravity. *Id.* at 291, 103 S.Ct. at 3010. Finally, a court may find it useful to compare the sentences imposed in other jurisdictions for the same crime. *Id.*

The gravity of D'Anjou's offense is great. Drug use, and the use of crack in particular, has become a pervasive, destructive force in American society.[4] D'Anjou was not merely a user; he was not even a single distributor. Instead, he helped to manage a ring of distributors by converting the crack from wholesale to retail quantities, supplying the distributors, and keeping the cash. He was a courier and an enforcer. The court found that D'Anjou was involved in distributing at least 5 kilograms of crack over a six month period. While not the mastermind of the operation, he was highly placed and tasked with significant responsibility.

Not only is the offense grave, but so is the punishment. Life without parole is the second most serious penalty available. Nevertheless,

> given that drug dealers themselves sentence many individuals to a lifetime of addiction and dependency, a life sentence for repeatedly dealing drugs cannot be considered disproportionately cruel and unusual.

*United States v. Meirovitz*, 918 F.2d 1376, 1381 (8th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991).

Given the substantial quantity of drugs involved here, and D'Anjou's position within the drug ring, we do not believe that life without parole is disproportionate to the crime involved.

Our analysis under steps two and three of the *Solem* structure does not change this view. Because sentencing under the Federal Sentencing Guidelines involves the calculation of offense characteristics across criminal categories, it is difficult to undertake the type of comparative analysis that the pre-guidelines *Solem* decision advises. Nevertheless, those courts that have done so have found that a life sentence for a major drug violation is not disproportionate in comparison with other sentences under the Guidelines, and we agree. See *Meirovitz*, 918 F.2d at 1381–82 and cases cited therein. Finally, a review of the statutes of states within this circuit discloses similarly severe sentences for narcotics violations of the magnitude involved here. See, e.g., N.C.Gen.Stat. § 90–95(h)(3)(c) (1993) (thirty five year to life sentence for 400 or more grams of cocaine); S.C.Code Ann. § 44–53–370(e)(2)(e) (Law.Co-op. 1992 Supp.) (twenty five to thirty year sentence with twenty five year mandatory minimum for 400 or more grams of cocaine); Va.Code Ann. § 18.2–248(C) (Michie 1993 Supp.) (forty year maximum on first violation).

 In addition, D'Anjou claims that life without the possibility of parole constitutes cruel and unusual punishment. In *Harmelin v. Michigan*, —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court implicitly answered this question against D'Anjou. In that case, the Court held that a sentence of life without parole does not require the consideration of mitigating factors, as is required in the death penalty scenario, to avoid being considered cruel and unusual. *Id.* at ——, 111 S.Ct. at 2701–02, 115 L.Ed.2d at 864–65. Since a mitigating factors analysis is not required to avoid an Eighth

---

4. As the Fifth Circuit has commented:

> Except in rare cases, the murderer's red hand falls on one victim only, however grim the blow; but the foul hand of the drug dealer blights life after life and, like the vampire of fable, creates others in its owner's evil image—others who create others still, across our land and down our generations, sparing not even the unborn.

*Terrebonne v. Butler*, 848 F.2d 500, 504 (5th Cir.1988) (en banc), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989).

Amendment violation, this necessarily means that the imposition of life without parole is not cruel and unusual.

### C

 D'Anjou argues finally that the district court erred in finding that at least five kilograms of cocaine base were attributable to him, and that the sentence must be overturned. As a question concerning the factual findings of the district court at sentencing, this is reviewed only for clear error. *United States v. Uwaeme,* 975 F.2d 1016, 1018 (4th Cir.1992).

 Under Sentencing Guideline § 1B1.3, in a conspiracy case such as this one, the defendant should be held accountable for the conduct of others that was both in furtherance of the conspiracy and reasonably foreseeable in connection with the conspiracy. The drug quantity to be attributed to D'Anjou therefore is not limited to the amount he personally handled, but rather is that amount that was reasonably foreseeable to him and in furtherance of the conspiracy. Since Mahon described D'Anjou at trial as being closest to him within the drug ring, the court did not err here in using Mahon's estimate of the total quantity of crack sold by the ring as the basis for D'Anjou's sentencing.

D'Anjou contends that Mahon's varying estimates of the amount of crack dealt, 15 kilograms overall or five to nine ounces a week, were mere puffing, and that the amount of at least five kilograms was insufficiently supported by the evidence. As indicated in application note 12 to § 2D1.1, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." Mahon was the head of the organization and was the person who best knew the amount involved. The district judge observed Mahon at trial and conducted the sentencing hearing and, based primarily on the evidence at trial, found that "even under the most benign view of the evidence before the Court ... there's at least five kilograms involved."

In this instance, the court's finding as to amount relied largely on the trial testimony and demeanor character of witnesses. While this court is generally reluctant to overturn factual findings of the trial court, this is doubly so where the question goes to the demeanor and credibility of witnesses at trial, since the district court is so much better situated to evaluate these matters. While the optimal result of a sentencing hearing is to have a firm number that can be clearly attributed to the defendant, the Sentencing Guidelines permit estimated amounts based on satisfactory evidence, and such estimates inherently possess a degree of uncertainty. In this instance, a review of the transcript of Mahon's testimony and deference to the district court's superior position in such a matter lead us to conclude that the court did not err in taking this amount to be reasonably foreseeable to D'Anjou based on his status as a "right-hand man" of Mahon. We therefore affirm.

*AFFIRMED.*