39 F.3d 1179
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Denley Earl WALTERS, Defendant-Appellant.
 No. 94-5161.
 United States Court of Appeals, Fourth Circuit.
 Argued Sept. 30, 1994.
Decided Nov. 4, 1994.
 
 Appeal from the United States District Court for the Middle District of North Carolina at Winston-Salem. Frank W. Bullock, Jr., Chief District Judge. (CR-93-190).
 ARGUED: Lawrence Jay Fine, Winston-Salem, North Carolina, for Appellant. Paul Alexander Weinman, Assistant United States Attorney, Greensboro, NC, for Appellee. ON BRIEF: William E. Martin, Federal Public Defender, Gregory Davis, Assistant Federal Public Defender, Greensboro, NC, for Appellant. Walter C. Horton, Jr., United States Attorney, Greensboro, NC, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before MURNAGHAN and MOTZ, Circuit Judges, and CHASANOW, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 After a jury in the United States District Court for the Middle District of North Carolina found Denley Earl Walters guilty of conspiracy to distribute cocaine base, he was sentenced to 200 months imprisonment and fined $5,000. Although in his appellate brief Walters asserted that there was insufficient evidence to support his conviction, at oral argument his counsel conceded that there was sufficient evidence of conspiracy to distribute cocaine to support Walters' conviction, and so that conviction is not challenged on appeal. Walters, however, does claim that certain errors infect his sentence. Specifically, he objects to the amount of cocaine attributed to him at sentencing, the 100:1 crack to powder cocaine ratio for sentencing purposes, and the court's failure to make specific findings about his ability to pay the imposed fine. Finding no error, we affirm.
 
 I.
 
 2
 On September 2, 1992, Tonya Arnett and Trinity Woods were stopped by a member of the Texas Regional Narcotics Trafficking Task Force in Nacogdoches, Texas. The two women were driving north in a Peugeot car with North Carolina plates, returning to Winston-Salem, North Carolina. A police search of the car revealed slightly more than a kilogram of powder cocaine underneath the hood of the car. Arnett gave a statement to a member of the task force, which led Winston-Salem police to search Racquel Douthit's condominium in Winston-Salem. At that time, Douthit also made a statement to the police. These statements revealed a conspiracy to distribute crack cocaine that involved Arnett, Douthit, Nigel Ormsby, Sanchez, and Walters.[1] The conspiracy in question dated back to at least February, 1992. At that time Sanchez and Douthit agreed to distribute marijuana on one occasion and crack cocaine "a couple of times." Their drug distribution operation was interrupted in February 1992 when Douthit was imprisoned on unrelated charges. When she was released on June 10, 1992, she paged Sanchez, but Walters responded to the page. Walters told Sanchez that Douthit had called; Sanchez called Douthit back and arranged a trip to Miami with her. Sanchez, Douthit, and Walters traveled to Miami together for a week, then Douthit and Sanchez, with the help of Walters and Arnett, resumed drug distribution activities. Sanchez supplied Douthit with $100 "cookies" of crack cocaine, which Douthit, in turn, sold. After approximately a month, Walters started delivering the "cookies" to Douthit. Arnett drove Douthit to "different areas in Winston-Salem" for the purpose of selling the drugs. "Around about the end of June or first of July," Arnett moved into Douthit's condominium. After the move, Arnett saw Walters and Sanchez and Nigel "sometimes everyday" when they would visit and drop off one hundred dollar "cookies" of crack cocaine. Arnett recalled six or seven times that Walters paged Douthit so that he could deliver crack cocaine to her.
 
 
 3
 Walters returned to Miami with Arnett a few weeks after his initial trip there with Douthit and Sanchez. According to Douthit, "him and Tonya [Arnett] went to Miami ... to pick up some drugs, and it was taking too long." A month after Walters and Arnett went to Miami, Walters made the first of three trips to Texas; each of which was "a couple of weeks" apart. Douthit testified that she was told by Sanchez that the purpose of Walters' trips to Texas was "to get some drugs." She further testified that Walters would pick up a "kilo of cocaine" on these trips.
 
 
 4
 Douthit testified that Sanchez, "would, like, ask me if I know anybody that want to buy a large quantity of drugs, and then I would page him, and he would bring the drugs wherever I'm at, and I give it to that person."[2] One of the people to whom Sanchez and Douthit supplied drugs was Diltha Patton. Douthit introduced Patton to Sanchez and Sanchez, in turn, introduced her to Walters, who delivered crack cocaine to Patton approximately "ten to fifteen times."[3]
 
 
 5
 In "about the middle of July," Walters and Douthit paid Arnett "about $300" to transfer the title of the Peugeot into her name. Six weeks later, Douthit told Arnett that she and Trinity Woods would have to go out of town. Douthit and Walters then proceeded to pick up Woods and bring her back to Douthit's condominium. Douthit, Ormsby, and Walters went upstairs, and when they came down, Sanchez gave each Arnett and Woods each $200. Sanchez "gave Nigel some numbers to call once he got there in Texas," and then Ormsby, Arnett, and Woods departed in the Peugeot for Texas. When they arrived in Texas, Ormsby called an unidentified man who led the three to a hotel. The next morning Ormsby and the unidentified man were seen "looking under the hood" of the Peugeot. That morning, Ormsby stayed behind in Texas and Woods and Arnett began the drive back to Winston-Salem that ended when they were stopped and arrested in Nacogdoches, Texas.
 
 
 6
 Walters testified at trial that he did not know of, or participate in, the drug activities of Sanchez, Douthit, or other members of the conspiracy.
 
 II.
 
 7
 Walters contends that the district court erred in attributing the 1002.06 grams of cocaine found in the Peugeot driven by Arnett and Woods to him. He asserts that he could not have reasonably foreseen that Arnett and Woods were travelling to Texas to pick up a kilogram of cocaine.
 
 
 8
 A district court must determine the amount of drugs attributable to a defendant at sentencing by a preponderance of the evidence. United States v. Irvin, 2 F.3d 72, 75 (4th Cir.1993), cert. denied, 114 S.Ct. 1086 (1994). A finding as to the amount of drugs attributable to a defendant is a question of fact and will only be reversed if it is clearly erroneous. United States v. Vinson, 886 F.2d 740, 742 (4th Cir.1989), cert. denied, 493 U.S. 1062 (1990). The United States Sentencing Commission Guidelines Manual defines "Relevant Conduct," "in the case of a jointly undertaken criminal activity," as "all reasonably foreseeable acts and omissions of others in furtherance of a jointly undertaken criminal activity." Guidelines Sec. 1B1.3(a)(1)(B); United States v. Banks, 10 F.3d 1044, 1057 (4th Cir.1993).
 
 
 9
 In the present case, the jointly undertaken criminal activity was the distribution of crack cocaine. Although Walters testified to the contrary, there was evidence at trial, if believed, to support a finding that Walters knew that the purpose of Arnett and Wood's trip to Texas was to pick up a kilo of cocaine. Racquel Douthit testified that Walters had travelled to both Miami and Texas to pick up a "kilo of cocaine." In addition, Douthit, Patton, and Arnett all testified that Walters delivered cocaine in its crack form. Under these circumstances, it was not clearly erroneous for the district court to attribute the entire amount of cocaine taken from the Peugeot to Walters. See United States v. Williams, 986 F.2d 86, 91 (4th Cir.1993), cert. denied, 113 S.Ct. 3013 (1993); United States v. Ellis, 975 F.2d 1061, 1067 (4th Cir.1992), cert denied, 113 S.Ct. 1352 (1993).
 
 III.
 
 10
 Walters also contends "that the 1:100 ratio between cocaine base ("crack") and cocaine powder ... is unconstitutional because its application has a disproportionate impact on African-Americans and, therefore denies them equal protection and due process as guaranteed by the United States Constitution." Walters recognizes that this court has previously considered and rejected constitutional challenges to the 100:1 ratio. See United States v. D'Anjou, 16 F.3d 604, 612 (4th Cir.), cert. denied, 114 S.Ct. 2754 (1994); United States v. Bynum, 3 F.3d 769, 774-775 (4th Cir.1993), cert denied, 114 S.Ct. 1105; United States v. Thomas, 900 F.2d 37, 39-40 (4th Cir.1990). In D'Anjou, we explained:
 
 
 11
 there is evidence that the line Congress and the Sentencing Commission have drawn has a disproportionate impact upon blacks. But this is not sufficient to make out an Equal Protection Violation .... here, there is no argument of discriminatory application ... nor evidence advanced that a discriminatory purpose entered the hearts of those who enacted the guideline provisions.... Absent such a showing, the statute is examined under the rational basis test, which it satisfies.
 
 
 12
 D'Anjou, 16 F.3d at 612.
 
 IV.
 
 13
 Finally, Walters contends that the district court erred because it did not make specific findings regarding his ability to pay when it imposed a $5,000 fine. "Under 18 U.S.C. Sec. 3572(a) a district court is required to consider certain factors--including a defendant's ability to pay--before imposing a fine. We have held that the district court must 'make specific fact findings on these factors,' and have vacated fines for which the district court failed to make such findings." United States v. Taylor, 984 F.2d 618, 621 (4th Cir.1993) [citations omitted].
 
 
 14
 In Taylor, we noted,
 
 
 15
 the court fined Taylor $2,000, a downward departure from the statutory minimum of $6,000, finding that Taylor was 'unable financially to pay a fine in a greater amount.' Taylor was order to pay the $2000 'during this term of incarceration through participation in the Inmate Financial Responsibility Program, with any unpaid balance to be paid through monthly installments during the term of supervised release. Id. at 620.
 
 
 16
 Taylor was sentenced to 63 months of prison and three years of supervised release. Id. In rejecting Taylor's challenge, we reasoned that, "Taylor failed to object to the fine at his sentencing hearing," and that "the district court did make a specific factual finding about Taylor's financial status. It found that Taylor was 'unable financially to pay a fine in a greater amount' than 2,000 and accordingly departed downward from the $6000 minimum ..." In addition, we noted, "The report states that Taylor had 'no income assets or financial obligations.' " Id. at 622. We refused to remand the case just "because neither the district court nor the presentence report stated in so many words that he could earn the $2000 while he was in prison." Id.
 
 
 17
 In this case, Walters was sentenced to 200 months in prison, five years of supervised release, and fined $5,000. The fine range for his offense was $20,000 to $4,000,000. The district court stated, "The $5,000.00 fine is below the guidelines considerably, but is an amount that the defendant, with no dependents and with some ability, could reasonably earn while incarcerated or upon release." The presentence report noted that Walters was "single with no dependents" and that he had a negative net worth of $702.00. The report then stated, "The defendant will be unable to pay a fine within the guideline range at the time of sentencing. He is, however, an able bodied individual who could pay a fine in installments under the direction of the Bureau of Prisons while incarcerated or while on a period of supervised release under the jurisdiction of the Court."
 
 
 18
 Walters, like the defendant in Taylor, did not object to his fine at trial. Moreover, again as in Taylor, the district court did make some specific findings as to the defendant's financial status. Furthermore, while Walters' term of imprisonment and of supervised release is significantly greater and his fine is slightly greater than those imposed in Taylor, the guideline range for the fine was much higher than that in Taylor and thus the downward departure was much more significant in the present case. Although Walters, unlike Taylor, had an outstanding debt, it was only $702.00. Finally, here the presentence report contained the statement that Walters had an income of $910.00 in 1990 and $384.47 in 1991, that he had no dependents, and that he was "an able bodied individual who could pay a fine in installments ..." There was no similar statement in the report in Taylor. For these reasons, here, as in Taylor, we refuse to remand just because the district court did not state in "so many words" that Walters could earn $5,000 while in prison.
 
 
 19
 AFFIRMED.
 
 
 
 [1]
 Arnett was arrested and charged for trafficking in cocaine. The charges against her were dropped. It is unclear if the charges were dropped in exchange for her testimony at Walters' trial or because the stop was ruled unconstitutional
 
 
 [2]
 Douthit entered into a plea agreement that permitted her prison time to be reduced in exchange for her testimony at Walters' trial
 
 
 [3]
 According to Patton, Walters would deliver "approximately four cookies at a time" on the ten to fifteen occasions he delivered drugs, each cookie "would weigh about a gram," she would "break the cookie down into smaller parts, and sell them for $25.00, and sometimes I would sell the cookie itself for a hundred." Douthit testified that when Walters delivered crack, it would be packaged in "hundred dollar cookies, half an ounce, and ounces" and that she was paid, "like for an ounce, or a half and ounce--a hundred for an ounce; and a half an ounce, fifty." Since 1 ounce equals 28.35 grams, Patton and Douthit obviously differed as to the amount of drugs Walters delivered. They were consistent, however, in their account of his intimate involvement in the conspiracy