**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 95-5362

GEORGE CHAMBERS, a/k/a Dave,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                               No. 95-5363

ANNE MARIE CHAMBERS, a/k/a Sugar,
a/k/a Anne Marie Jack,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 95-5364

PHILLIP CLARK, a/k/a Mark,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 95-5496

TONY DYSON,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert R. Merhige, Jr., Senior District Judge.
(CR-94-89)

Argued: March 8, 1996

Decided: September 10, 1996

Before ERVIN and NIEMEYER, Circuit Judges, and YOUNG,
Senior United States District Judge for the District of Maryland,
sitting by designation.

_____

Affirmed by unpublished opinion. Judge Ervin wrote the opinion, in
which Judge Niemeyer and Senior Judge Young joined.

_____

**COUNSEL**

**ARGUED:** Jeffrey Lee Everhart, Richmond, Virginia, for Appellant
George Chambers; Gregory William Franklin, Richmond, Virginia,
for Appellant Anne Chambers; Robert Patrick Geary, Richmond, Vir-
ginia, for Appellant Dyson; Elizabeth Dashiell Scher, MOR-
CHOWER, LUXTON & WHALEY, Richmond, Virginia, for
Appellant Clark. Joan Elizabeth Evans, Assistant United States Attor-
ney, Richmond, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey,
United States Attorney, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

ERVIN, Circuit Judge:

I.

The appellants--George Chambers, his wife, Anne Marie Chambers, Tony Dyson, and Philip Clark--were charged with various offenses related to a crack distribution ring operating in the mostly rural areas of Caroline, Spotsylvania, and Louisa Counties, Virginia. The organization allegedly used couriers to smuggle shoplifted goods into Jamaica and return with cocaine powder, which was cooked into crack in New York and forwarded to the Eastern District of Virginia for sale in crack houses. A jury convicted all four appellants of conspiring to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. § 846 and 19 U.S.C. §2. In addition, George Chambers was convicted of two counts of possessing with intent to distribute in excess of 50 grams of cocaine base, under 21 U.S.C.§§ 841(a)(1). Anne Marie Chambers was convicted of one count of using a firearm during a drug trafficking crime, under 18 U.S.C.§ 924(c)(1), and one count of importing cocaine into the United States, under 21 U.S.C. § 952. Philip Clark was additionally convicted of possessing with intent to distribute and distributing crack cocaine, in violation of 21 U.S.C. § 841(a)(1). The appellants challenge the sufficiency of the evidence supporting their convictions, and raise various sentencing issues. We affirm.

II.

All four appellants challenge the sufficiency of the evidence supporting their conspiracy convictions[1] on the ground that the govern-

_____

[1] In Appellants' brief and at oral argument, Anne Marie Chambers also challenged the sufficiency of the evidence supporting her conviction for wilfully and intentionally using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). The charge related to a nine millimeter pistol purchased from a pawn shop by Lora Wright--a straw purchaser who used funds supplied by Chambers, and who was later paid partly in drugs for her services. Chambers argued that the government failed to carry its burden of showing that the weapon was

ment's evidence consisted exclusively of testimony by co-defendants or accomplices. The appellants argue that the testimony was self-interested and therefore unreliable, and contained inconsistencies. To support a conviction, the evidence--when viewed in the light most favorable to the government--must be sufficient for a rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994), cert. denied, 115 S. Ct. 954 (1995). Having carefully reviewed the record, we are confident that the appellants had every opportunity to challenge the inconsistencies, criminal histories, biases, and motivations of the government's witnesses during cross-examination and argument. We find the substance of the eight government witnesses' eyewitness testimony adequate to establish the appellants' guilt if the jury found the evidence believable--which, apparently, it did. The jury's decision on the credibility of witnesses is not reviewable by this court. Trimed, Inc. v. Sherwood Medical Co. , 977 F.2d 885, 888 (4th Cir. 1992).

The appellants also contest the quantities of drugs attributed to them by the district court during sentencing. At trial and at sentencing,[2] the government submitted evidence that George Chambers cooked the cocaine into crack "cookies"[3] in New York, and that various couriers

---

used during or in relation to a drug trafficking crime. See Smith v. United States, 508 U.S. 223, 228 (1993). Chambers distinguished her case from Smith, in which the Supreme Court held that an exchange of guns for narcotics constituted "use" of a firearm under§ 924(c)(1). Id. at 237. Rather, she argued, her payment of drugs to Wright was an exchange of narcotics for a service rendered. Anne Marie Chambers later moved to withdraw the appeal of her 18 U.S.C. § 924(c)(1) conviction, and on May 13, 1996, this court granted her motion.

[2] Tony Dyson's sentencing hearing was continued and conducted separately from the other appellants. At Dyson's hearing, the Government presented evidence that Dyson began working for the ring toward the end of September 1993 as a driver and runner. As a runner, Dyson would take orders from and deliver drugs to numerous cars pulling up at crack dealing locations operated by the conspiracy. The Government's evidence tended to show that Dyson sold approximately one half ounce of crack every week over the course of about three months.

[3] At trial, witnesses explained that George Chambers would "cook" cocaine powder into crack using a glass tea or coffee pot. The resulting round piece of crack was called a "cookie."

4

transported an average of one or two cookies per week to Virginia. The witnesses offered varying estimates of the value and size of the drugs they handled or saw. Rose Mason described a cookie as about three to four inches in diameter and about two inches thick. Tina Anderson described a cookie as the diameter of a glass tea kettle, and an inch to an inch-and-a-half thick. Lora Wright described a cookie as about six inches in diameter and one-and-a-half to two inches thick. She described the $100.00 rock of cocaine that she received in payment as about the size of a twenty-five-cent piece. Detective Laura Dawson testified that co-conspirator Shawn Chambers was arrested in possession of about five ounces of crack, which he described to be a half-cookie. The other half, he said, was transported in a separate car by George and Anne Marie Chambers. Dawson testified that Shawn said that the Chambers brought one-and-a-half kilos of cocaine from Jamaica every two weeks. Linda Mixon testified that Anne Marie Chambers provided Philip Clark with $2,000-$2,500 in crack to sell each week for about eleven weeks. A case agent testified that one ounce of crack sold for about $1,000. Based on that evidence, the court held each defendant responsible for five ounces of crack for each week of their involvement in the conspiracy, amounting to 7.2 grams for Anne Marie Chambers, 623.7 grams for Phillip Clark,[4] and 340 grams for Tony Dyson.[5]

_____

[4] Phillip Clark also argues that the evidence does not support a finding that he personally handled 623.7 grams of cocaine. The largest amount attributed to him by government witnesses was $2,500 worth of crack each week for eleven weeks, or about 275 grams. However, under the Guidelines, the quantity to be attributed to a defendant in a conspiracy case is "not limited to the amount he personally handled, but rather is that amount that was reasonably foreseeable to him and in furtherance of the conspiracy." United States v. D'Anjou, 16 F.3d 604, 614 (4th Cir.), cert. denied, 114 S. Ct. 2754 (1994). Because Clark was described at trial as one of the "main people" in the conspiracy, who not only distributed the crack, but helped to cut and bag it, he potentially could be held accountable for up to the total quantity of crack sold by the ring.

[5] Tony Dyson also challenges the quantity of drugs for which he was held responsible, on the basis that the witnesses who testified at his sentencing were not credible. The credibility of witnesses is the domain of the sentencing judge. See United States v. Falesbork, 5 F.3d 715, 721-22 (4th Cir. 1993).

The appellants contend that, because the witnesses never weighed the crack cocaine "cookies," and were unable to give precise and consistent evidence as to their size, the district court erred in holding them responsible for any weight at all. We find no merit in this argument. In a case such as this, " `[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.' " United States v. D'Anjou, 16 F.3d 604, 614 (4th Cir.) (quoting U.S.S.G. § 2D1.1, comment n.12), cert. denied, 114 S. Ct. 2754 (1994). The Guidelines do not demand certainty and precision; they demand that a court do the best that it can with the evidence in the record, erring on the side of caution. See United States v. Cook, 76 F.3d 596, 604 (4th Cir. 1996); United States v. Uwaeme, 975 F.2d 1016, 1018-19 (4th Cir. 1992). We find that the district court did just that--it took a deliberately cautious approach and made findings that were well-supported by the record. Reviewing for clear error, United States v. Goff, 907 F.2d 1441, 1444 (4th Cir. 1990), we do not find any.

George Chambers challenges the enhancement of his sentence, under U.S.S.G. § 2D1.1(B)(1), for possession of a firearm during the conspiracy. The enhancement was improper, he contends, because it was based upon one witness's uncorroborated testimony that she saw him with a gun. We disagree. It is well-established in this circuit that the testimony of a co-conspirator--"standing alone and uncorroborated"--is enough to determine relevant conduct. United States v. Burns, 990 F.2d 1426, 1439 (4th Cir.), cert. denied, 508 U.S. 967 (1993). In addition, we note that there was more in the record to support the enhancement than simply one witness's statement. In a signed statement admitted into evidence, another witness attested that she delivered a box of soap powder from Virginia to George Chambers in New York. Chambers opened the box, which contained a black-colored handgun, then retaped the box and placed it in a barrel for shipment to Jamaica. Still another witness testified that she transported five to ten guns from Virginia to the Chamberses' apartment in New York. A court may properly impute to a defendant a co-conspirator's use of a firearm. United States v. Moore, 29 F.3d 175, 178 (4th Cir. 1994); United States v. Falesbork , 5 F.3d 715, 720 (4th Cir. 1993). We conclude that the district court's determination was supported by the record and was not clearly erroneous.

6

George also argues that the enhancement was improper because it led to an unfair, disproportionate result. While he was not charged with using or possessing a firearm in a drug trafficking offense, his two-level enhancement ratcheted his sentencing range up to a level requiring mandatory life in prison. In contrast, Anne Marie Chambers --who was actually convicted beyond a reasonable doubt of using or possessing a firearm in a drug trafficking offense--received only an additional five years on top of her underlying sentencing range of thirty years to life. Thus, subject to the discretion of the sentencing judge, Anne Marie could have received a minimum sentence of thirty-five years. On the other hand, Mr. Chambers earned mandatory life imprisonment based only on a preponderance of the evidence. We recognize that, under the circumstances, the Guidelines have worked a troublingly peculiar result, and that the issue may warrant the consideration of the Sentencing Commission and Congress.[6] Nevertheless, a sentencing court must apply the Guidelines as it finds them, and a disparity in sentences amongst co-conspirators is not a proper basis for a downward departure. United States v. Ellis, 975 F.2d 1061, 1066 (4th Cir. 1992), cert. denied, 507 U.S. 945 (1993). We find no error.

George Chambers also challenges the four-level enhancement of his sentence under U.S.S.G. § 3B1.1(a) for being an organizer, manager, or otherwise extensively involved in the criminal activity. We review the district court's determination of his role in the offense for clear error. United States v. Hyppolite, 65 F.3d 1151, 1159 (4th Cir.

_____

[6] That said, there is no reason to believe that the Sentencing Commission was not fully aware of the potential disparity between the penalties under section 924(c) and under the Guideline enhancement scheme when it designed a penalty system investing prosecutors with the discretion to elect whether to charge under the separate substantive offense or to seek an enhancement, depending on the strength of their cases. See United States v. Foote, 898 F.2d 659, 666 (8th Cir.) ("The fact that the prosecutor is empowered to choose between charging a violation of section 924(c) and merely seeking an enhancement of sentence based on his evaluation of the strength of the case against the defendant does not in any way violate the statutory goal of `avoid[ing] unwarranted sentence disparities.' 21 U.S.C. § 3553(a)(6)."), cert. denied sub nom. Thompson v. United States, 498 U.S. 838 (1990), cert. denied sub nom. Williams v. United States, 498 U.S. 938 (1990).

1995), cert. denied, 116 S. Ct. 1558 (1996). Chambers contends that the government's evidence demonstrated only that he cooked, cut, and bagged crack "on occasion," but did not demonstrate by a preponderance of the evidence that he directed or controlled others. However, control over others is not the only characteristic supporting a leader or organizer role enhancement. United States v. Harris, 39 F.3d 1262, 1270 (4th Cir. 1994). Application Note 4 of the Commentary to § 3B1.1 instructs a court to consider

> . . . the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Based on those characteristics, the record readily supports Chambers's role enhancement. The Government introduced testimony showing that George Chambers not only cooked, cut, bagged, and sold crack, he also played a leadership role in nearly every aspect of the organization. The Government presented testimony that Chambers paid crack house owners for the use of their houses as drug sale venues. In addition, it presented evidence tending to show that he met couriers at the airport in New York and took them back to the Chamberses' apartment, where he supplied them with cocaine, and returned them to the airport. There was evidence that he paid for at least one courier's airline ticket. Similarly, witnesses testified that when other couriers would arrive weekly or biweekly by bus at the Chambers' apartment, George Chambers would leave and return with powder cocaine, which he cooked into crack and sent back with the couriers to Virginia. In addition, the evidence tended to show that Chambers was responsible for handling the operation's finances. Witnesses testified that, on six or eight occasions, they transferred to him as much as ten thousand dollars through Western Union. Other witnesses described bringing proceeds to New York to give to George Chambers. There was evidence that he and his wife Anne Marie Chambers had discussions pertaining to financial aspects of the business. Finally, the Government presented evidence that George Chambers gave instructions to other conspirators. For example, one witness tes-

8

tified that he instructed her to buy a tea kettle for cooking crack, and then paid her in drugs. Another witness testified that Chambers instructed couriers on how to conceal drugs in car door panels for transport. We conclude that the court's enhancement for role in the offense was not clearly erroneous.

Finally, the appellants argue that the district court erred in refusing to depart downward from the Guidelines on the basis of a Sentencing Commission Special Report to Congress recommending elimination of the 100-to-1 sentencing disparity between powder and crack cocaine.[7] We repeatedly have upheld the sentencing disparity between crack and powder cocaine. E.g., United States v. Fisher, 58 F.3d 96, 99-100 (4th Cir.), cert. denied, 116 S. Ct. 329 (1995). Our holding is not affected by the Sentencing Commission's recommendation. United States v. Hayden, 85 F.3d 153, 158 (4th Cir. 1996); United States v. Anderson, 82 F.3d 436, 438 (D.C. Cir. 1996) (holding that the Commission's Special Report does not give the district court the authority to depart from established sentencing levels). Unless and until the law changes, the district court is obligated to follow it. In the absence of an incorrect application of the Guidelines or other violation of the law, we cannot review a district court's discretionary refusal to depart downward. United States v. Bayerle, 898 F.2d 28, 31 (4th Cir.), cert. denied, 498 U.S. 819 (1990).

III.

In conclusion, we are not persuaded by the appellants' contentions on appeal, and therefore affirm the judgments of the district court.

AFFIRMED
_____
[7] We note that Congress eventually rejected the recommendation.

9