**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5407

STEVEN DESMOND PETERSON, a/k/a
Primo,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5449

CHARLES EDWARD HERRING, JR., a/k/a
Foo Foo, a/k/a Charles Edward
Johnson,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 95-5518

ANTHONY LAVON MILES, a/k/a Tony,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5519

SHANE FELLS, a/k/a Q, a/k/a Quasim
Yusef Johnson,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of North Carolina, at Fayetteville.
Malcolm J. Howard, District Judge.
(CR-94-46-H)

Argued: January 28, 2000

Decided: March 24, 2000

Before WILKINSON, Chief Judge, and MICHAEL
and TRAXLER, Circuit Judges.

_____

Affirmed in part and vacated in part by unpublished per curiam opin-
ion.

_____

**COUNSEL**

**ARGUED:** William Lee Davis, III, Lumberton, North Carolina, for
Appellant Peterson; Wayne James Payne, Shallotte, North Carolina,
for Appellant Miles; Alvin Garnell Matthews, Fayetteville, North
Carolina, for Appellant Herring; Danny Thomas Ferguson, Winston-
Salem, North Carolina, for Appellant Fells. Anne M. Hayes, Assistant
United States Attorney, Raleigh, North Carolina, for Appellee. **ON
BRIEF:** Janice McKenzie Cole, United States Attorney, Emily B.
Berndt, Third Year Law Student, Raleigh, North Carolina, for Appel-
lee.

2

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Shane Fells, Steven Desmond Peterson, Charles Edward Herring, and Anthony Lavon Miles appeal from their convictions on various drug-related charges. We affirm in part and vacate in part.

I. BACKGROUND

Ten defendants were charged in a 40-count indictment arising from a drug-trafficking conspiracy. Several of the defendants pleaded guilty, and the case proceeded to trial against the remaining defendants, including the Appellants in this case.

At trial, the government presented evidence establishing the existence of a drug-trafficking organization operating primarily out of the Hollywood Heights area in Fayetteville, North Carolina. Fells, who lived in Greensboro, North Carolina, generally arranged for the acquisition of cocaine powder in New York. From Fells, the cocaine was given to Peterson, Fells's brother, who was in charge of the Fayetteville distribution network. Peterson parcelled out the cocaine, usually in the form of crack cocaine, to other members of the conspiracy, who in turn distributed it to other sellers or sold it at the street level. The jury convicted each of the Appellants on various counts of the indictment.

The Appellants challenge certain errors they contend occurred during the trial and sentencing proceedings. We address the trial issues first and then the sentencing issues.

II. TRIAL ISSUES

A.

Fells contends that the district court erred by denying his motion to suppress the evidence found during the execution of what he con-

3

tends was an illegal search warrant. According to Fells, the affidavit in support of the warrant application did not establish probable cause to believe that the evidence sought would be located at the house to be searched. Fells also contends that the "good faith" exception established by the Supreme Court in United States v. Leon, 468 U.S. 897, 913 (1984), is inapplicable to this case.

Probable cause exists when "there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search." United States v. Suarez, 906 F.2d 977, 984 (4th Cir. 1990). "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993). "We review legal conclusions involved in the district court's suppression determination de novo but review factual findings underlying the legal conclusions subject to the clearly erroneous standard." United States v. Rusher, 966 F.2d 868, 873 (4th Cir. 1992).

Based on the affidavit of ATF Special Agent J.D. Newman, the magistrate issued a warrant authorizing the search of a residence located at 1709 Fleming Road in Greensboro. In his affidavit Newman stated he was a member of an on-going multi-jurisdiction investigation of Fells, Peterson, and others suspected of trafficking drugs. Newman stated that the investigation revealed that Fells supplied the cocaine to be distributed in Fayetteville through Peterson and that the investigation connected Fells and Peterson to a murder where shots were fired from a silver Toyota Cressida.

Newman further stated that on the day before his application for the warrant, he assisted in the execution of a state arrest warrant for Fells. Fells was arrested while he was driving a car in which Crystal Whitney was a passenger. Newman interviewed Whitney, who told him that Fells lived at 1709 Fleming Road and had a safe in the house. When Newman went to that address with Whitney, he saw a silver Toyota Cressida in the driveway. Whitney told Newman that the car belonged to Peterson, and that the car was brought to the

house after Peterson "had gotten into trouble with the law." In his affidavit Newman also outlined his training and experience in investigating narcotics trafficking and stated that, based on his experience, he knew that drug traffickers frequently keep large amounts of cash, as well as books or records documenting their drug transactions, in their residences, often in safes.

In our view, the facts alleged in the affidavit establish probable cause to believe that evidence of drug trafficking would be found at 1709 Fleming Drive. The presence at that address of the Toyota Cressida, which was believed to have been involved in a drug-related murder, created a substantive connection between the residence and the crimes being investigated. In addition, the magistrate could reasonably infer from the nature of the items to be seized, which included books, records, and other documentary evidence of drug trafficking, and from Agent Newman's statement about the normal practices of drug dealers, that such items would be kept at Fells's residence. See United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988) (A "nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."); United States v. $149,442.43 in United States Currency, 965 F.2d 868, 874 (10th Cir. 1992) ("[C]ourts often rely on the opinion of police officers as to where contraband may be kept. Where a suspect has no place of business separate from his residence, it is reasonable for an officer to conclude that evidence may be at the suspect's residence." (citation omitted)). The affidavit, therefore, established a sufficient nexus between the place to be searched and the items to be seized.

Moreover, even if the warrant were defective, Leon's "good faith" exception would apply. In Leon, the Supreme Court held that evidence obtained by "officers reasonably relying on a warrant issued by a detached and neutral magistrate" is admissible. Leon, 468 U.S. at 913. This exception, however,

> does not apply in four situations: first, when the warrant is based on an affidavit containing "knowing or reckless falsity"; second, when the magistrate has simply acted as a "rubber stamp" for the police; third, when the affidavit does not "provide the magistrate with a substantial basis for

determining the existence of probable cause"; and finally, when the warrant is so "facially deficient" that an officer could not reasonably rely on it.

United States v. Wilhelm, 80 F.3d 116, 121 (4th Cir. 1996). In this case, there is no allegation that the affidavit contained any false or misleading information, or that the magistrate abandoned his judicial role by rubber-stamping the warrant. Nor is the warrant itself facially deficient. Even if the allegations of the affidavit were insufficient to establish a nexus between Fells's residence and the group's drug activities, they are "not so lacking in probable cause that the officers' reliance upon [the warrant] was objectively unreasonable." Lalor, 996 F.3d at 1583. The district court, therefore, properly denied the suppression motion.

B.

Peterson and Herring challenge the sufficiency of the evidence to support certain of their convictions. A jury's verdict in a criminal case "must be upheld on appeal if there is substantial evidence in the record to support it." United States v. Wilson, 198 F.3d 467, 470 (4th Cir. 1999). Substantial evidence is evidence that, when viewed in the light most favorable to the government, "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

1.

Peterson first contends that the evidence was insufficient to support his conviction for engaging in a continuing criminal enterprise. See 21 U.S.C.A. § 848(c) (West 1999). To sustain a conviction for engaging in a continuing criminal enterprise ("CCE"), the government must prove that:

> (1) defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more

6

persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Wilson, 135 F.3d 291, 303 (4th Cir. 1998). Peterson contends that the evidence is insufficient to support his CCE conviction because the government failed to prove that he managed or supervised the enterprise or that he derived substantial income from the enterprise.

As to the managerial element, we conclude that the government presented substantial evidence that Peterson served as a manager, supervisor, or organizer of five or more persons. The government presented the testimony of Antonio Duerson, Robert Jordan, Tyrone Whitehead, Ronald Andrews, and Donald Melvin, all of whom testified that they distributed crack cocaine they received from Peterson. The government's evidence established that Peterson was often involved in trips to New York, where the group obtained its cocaine, and that it was Peterson who determined which sellers would get what quantity of drugs for distribution.

Duerson testified that Andrews, Jordan, Herring, and others all worked for Peterson, and that Peterson recruited Duerson to work for him as well. Duerson testified that after a safe containing approximately $10,000 in drug proceeds was stolen from Andrews's house, Duerson became Peterson's "head man." J.A. 202-03. Ronald Andrews testified that after the safe was stolen, Peterson told him he had to "work off" the money. J.A. 799. At Peterson's direction, Andrews, Peterson, Duerson, Whitehead and others set about robbing other drug dealers to earn back the money.

This evidence, particularly when considered with Peterson's own statement to a postal inspector that "there is no one in this above me," is more than sufficient to support the managerial element necessary for a CCE conviction. See United States v. Johnson, 54 F.3d 1150, 1155 (4th Cir. 1995) (concluding that the managerial element was satisfied in a case where the government's evidence demonstrated that the Appellants "managed the transportation of large quantities of crack from New York and Washington, D.C., to central Virginia, and

7

distributed that crack to several dealers directly supervised by [the] Appellants" and the evidence established that each Appellant supervised the work of more than five dealers).

We likewise conclude that the government presented sufficient evidence that Peterson derived "substantial income" from the drug trafficking. The government's evidence established that the drug ring distributed many kilograms of cocaine and that a majority of the drugs ultimately distributed in Fayetteville, as well as the proceeds from those sales, passed through Peterson's hands. Various members of the operation described numerous drug transactions involving thousands of dollars each. The government also presented evidence establishing that Peterson owned a BMW and another car worth twice as much as the BMW and that Peterson had a bank account in the name of another person to prevent the authorities from seizing it. Taken together, this evidence is more than sufficient to satisfy the government's burden of proving that Peterson derived substantial income from his drug trafficking activities. See United States v. Webster, 639 F.2d 174, 182 (4th Cir. 1981) (rejecting defendant's argument that the evidence was insufficient to prove that he received substantial income from his continuing criminal enterprise: "[G]iven the quantity of drugs which were shown to have been moving in and out of Webster's possession, the jury would have been justified in concluding that he had received tens of thousands or even hundreds of thousands of dollars from his drug business. The evidence was thus more than sufficient for conviction.").

2.

The jury also convicted Peterson of intentionally killing Chanovan Martin in furtherance of the CCE. See 21 U.S.C.A. § 848(e)(1)(A) (West 1999). To sustain a conviction for intentional killing in furtherance of a CCE, the government must prove that the defendant was engaged in or working in the furtherance of the CCE; that the defendant intentionally killed the victim or commanded, induced, procured or caused the victim's intentional killing; and that there was a substantive connection between the killing and the CCE. See United States v. Tipton, 90 F.3d 861, 887 (4th Cir. 1996). Peterson contends that the evidence did not establish that the killing was done in further-

8

ance of the CCE, that it was commanded or procured by Peterson, or that it was intentional.

As mentioned above, Peterson and other members of the group decided to rob drug dealers as a way to earn money for the organization and to recoup the money that was lost when the safe was stolen. Those who committed the robberies generally were armed, and many wore bullet-proof vests. The robberies were often violent, with several victims being pistol-whipped or shot. On one occasion, the group even took a hostage. Although some of these robberies were successful, many were not. Martin was killed by Antonio Duerson during one of the group's robberies-gone-awry.

On the night Martin was killed, Peterson, Duerson, Andrews, and one or two others went looking for someone to rob. Andrews wore a bullet-proof vest and a ski mask, while the others wore "dark uniforms" with bandannas over their faces. After an unsuccessful attempt to rob one group, the men drove to another area of town. The men pulled their cars in front of a group of people and jumped out of the cars, demanding that the people "give it up." J.A. 282. Peterson and Andrews, who were both armed, focused on one of the victims, while Duerson "covered" two other victims. Andrews and Peterson's victim apparently would not cooperate, and Peterson shot him in the hip while Andrews pistol-whipped him. When Duerson heard the shot fired, he turned and looked in that direction. Duerson testified that when he turned back around, Martin "was right there, and I shot." J.A. 282. On cross-examination, Duerson stated that the shooting was "a spur-of-the-moment thing, I was excited and I was just scared." J.A. 357.

Because Peterson conceived of the robberies as a means of replacing the money the drug ring lost when the safe was stolen and directed other members of the group to participate in the robberies,[1]

_____

[1] An incident with Alvin Purdie illustrates the degree of Peterson's control over the robberies. Purdie owed Peterson money, and, at Peterson's direction, Purdie and others set out in search of someone to rob. Purdie apparently was somewhat hesitant to commit the robbery, and the group came back empty-handed. Peterson became angry when he learned of the failed robbery and hit Purdie with a pistol, telling him to "go out there and get my money." J.A. 278. Purdie's group went out again that night and managed to take some money and jewelry from three men on the street.

the jury could reasonably conclude that Martin's killing had a substantive connection to the CCE and was in furtherance of the CCE. See United States v. Jones, 101 F.3d 1263, 1267 (8th Cir. 1996) (In a case where the defendant was convicted of engaging in a narcotics-related CCE, evidence that the defendant killed his victim because the victim stole drugs from the defendant was sufficient to show that the killing was in furtherance of the CCE.); cf. United States v. Cooper, 19 F.3d 1154, 1165 (7th Cir. 1994) ("Consistent with its common meaning, working `in furtherance' of a continuing criminal enterprise means working to promote or advance the interests of a continuing criminal enterprise.").

Likewise, the government presented substantial evidence from which the jury could reasonably conclude that Peterson commanded, induced, procured, or caused Martin's killing. Count 6 of the indictment, which charged Peterson and Duerson with the intentional killing of Martin, also alleged a violation of 18 U.S.C.A. § 2(a) (West 1969), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." See United States v. Walker, 142 F.3d 103, 113 (2d Cir.) ("[A]iding and abetting liability [is] available" for CCE-murder.), cert. denied, 119 S. Ct. 219 (1998).

"A defendant is guilty of aiding and abetting if he has `knowingly associated himself with and participated in the criminal venture.'" Burgos, 94 F.3d at 873. To prove the defendant's association with the criminal venture, "the Government must establish that the defendant participated in the principal's criminal intent, which requires that a defendant be cognizant of the principal's criminal intent and the lawlessness of his activity." Id. If nothing else, the evidence that Peterson hatched the robbery scheme, was actively involved in the attempted robbery that led to Martin's death, and in fact fired the first shot is evidence that Peterson procured, induced, or aided and abetted Duerson's killing of Martin, a killing that was certainly foreseeable given the group's prior activities.

We also conclude that the government presented more than enough evidence from which the jury could conclude that the killing of Martin was intentional. While Duerson testified that the killing was "spur-of-the-moment," that would not prevent the jury from concluding that

10

the killing was intentional. Duerson testified that he pulled the trigger, and there is no suggestion that the gun misfired or that he pulled the trigger accidentally.

Peterson, however, contends that Duerson pleaded guilty to second-degree murder, and that his liability, therefore, "should not be any greater than that of the principal actor that is alleged to have been aided and abetted." Brief of Appellants at 38. This argument is without merit. Duerson and Peterson were charged in the same count of the indictment with intentionally killing Martin in furtherance of a CCE. The record reveals that Duerson pleaded guilty to the murder charge and that the government agreed to dismiss the remaining charges against him. As to the murder charge, there is simply no indication that the government accepted a guilty plea to anything other than the charge as alleged in the indictment.

Accordingly, we conclude that the government presented sufficient evidence to support Peterson's CCE and CCE-murder convictions.

3.

Herring contends that the government's evidence was insufficient to support his convictions for conspiracy to possess cocaine and cocaine base with intent to distribute, see 21 U.S.C.A. § 846 (West 1999), and possession with intent to distribute more than 50 grams of cocaine base, see 21 U.S.C.A. § 841(a)(1) (West 1999). To prove a conspiracy to possess narcotics with intent to distribute, the government must prove beyond a reasonable doubt that:"(1) an agreement to possess [narcotics] with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." Burgos, 94 F.3d at 857. To prove the possession charge, the government must establish that Herring knowingly and intentionally possessed cocaine base with the intent to distribute it. See United States v. Williams, 41 F.3d 192, 199 (4th Cir. 1994). In our view, the government presented evidence from which a reasonable jury could find beyond a reasonable doubt the presence of each element of the charges.

Duerson testified that Herring was involved with Peterson and that he, Herring, and Robert Jordan accompanied Fells and Peterson on a

trip to New York to obtain cocaine. Jordan testified that on the way back to Fayetteville from New York, the cocaine was hidden inside the sunroof of one of the cars. While driving through Fort Bragg, Herring instructed Jordan to remove the cocaine from the sunroof, and they discussed what to do if they were stopped by police. According to Duerson, Herring was present when Fells converted the cocaine powder obtained on that trip into cocaine base. Duerson also testified that he was in Greensboro on another occasion when Herring returned from a different trip to New York and turned over the cocaine to Fells. Peterson received a portion of that cocaine, and Herring in turn received a portion from Peterson.

Duerson testified that part of his responsibility during the time he was Peterson's "right-hand man" was to distribute the drugs "to people in our group," and Duerson included Herring in his list of the members of the group. J.A. 276. Tyrone Whitehead, another member of the conspiracy, testified that he obtained cocaine base from Peterson and that from time to time he distributed some of his portion to Herring, while Donald Melvin testified that he occasionally purchased cocaine base from Herring. Duerson also testified that Herring, Peterson, and Ron Andrews went together to Duerson's house because they suspected that Duerson may have been involved in the theft of the safe. In addition, the government's evidence established that Herring was involved in at least one of the group's attempts to rob other drug dealers.[2]

Contrary to Herring's argument, this evidence establishes much more than Herring's mere presence while crimes were being commit-

_____

[2] In his brief, Herring takes issue with some of this evidence, contending it was contradicted by testimony of other witnesses or that the witnesses themselves were not credible. However, it is "[t]he jury, not the reviewing court, [that] weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994) (citation omitted); see also United States v. Burns, 990 F.2d 1426, 1439 (4th Cir. 1993) ("[T]he testimony of a defendant's accomplices, standing alone and uncorroborated, can provide an adequate basis for conviction.").

ted. Instead, we believe that a jury could reasonably conclude from this evidence that Herring was a knowing and willing member of the conspiracy who engaged in activities in furtherance of the conspiracy. See United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir. 1984) ("To sustain [a] conspiracy conviction, there need only be a showing that [the] defendant knew of the conspiracy's purpose and some action indicating his participation. These elements can be shown by circumstantial evidence such as [the defendant's] relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude, conduct, and the nature of the conspiracy." (citation omitted)).

As to the possession convictions, however, Herring contends that there was no evidence to show that he possessed cocaine base in March, April, October, or November 1993, the time periods specified in the counts of the indictment for which Herring was convicted. Understanding this argument to be raising the question of a variance between the indictment and the proof presented at trial, we find no reversible error.

"The rule against variance protects defendants by insuring that the indictment provides them with adequate notice to prepare a defense and describes the crime with sufficient particularity to protect them from multiple prosecutions for the same offense. Absent prejudice to one of those interests, variance is harmless error." United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir. 1993) (citation omitted). Because the indictment sufficiently notified Herring of the crimes against which he was required to defend and because Herring does not contend that he was prejudiced by the variance, any error was harmless. See United States v. Odom, 736 F.2d 104, 118 (4th Cir. 1984) ("Any variance between indictment and proof which does not modify the elements of the crime charged will not invalidate a conviction unless it prejudices the defendant.").

Moreover, "[p]roof that a crime occurred reasonably near the date charged in the indictment is sufficient unless time is a material element of the offense or the actual date of the offense implicates the statute of limitations or follows the indictment." Brewer, 1 F.3d at 1437. Duerson's testimony indicates that he became involved with the drug ring sometime around March 1993. His first trip to New York,

13

which included Herring, took place around April 1993. Duerson participated in a total of four or five trips between April 1993 and October 1993, when Duerson was arrested for the murder of Chanovan Martin, including one trip made sometime between August and October. This evidence, particularly when considered with Duerson's testimony that Herring was one of the members of the group to whom he generally distributed the cocaine obtained in New York, sufficiently establishes that Herring possessed cocaine or aided and abetted the possession of cocaine on multiple occasions reasonably near the dates alleged in the indictment. See id. Because the date of possession is not a material element to the charge of possession with intent to distribute, the actual date of occurrence does not implicate the statute of limitations, and the transactions at issue all preceded the indictment, the evidence was sufficient to sustain Herring's convictions for possession with intent to distribute.

C.

Both Herring and Miles contend that the district court deprived them of their right to a fair trial when the court departed from its neutral role and made disparaging comments to their attorneys. "The law is well settled that the behavior and bearing of a judge during a jury trial must be such that the entire trial will be conducted in a general atmosphere of impartiality." United States v. Cassiagnol, 420 F.2d 868, 878 (4th Cir. 1970). We review the district court's conduct for an abuse of discretion. See United States v. Castner, 50 F.3d 1267, 1272 (4th Cir. 1995).

1.

During cross-examination of Ronald Andrews, Herring's attorney asked a series of questions attempting to establish that no drugs were sold from Andrews's house during the period of October to November 1993, the period alleged in one of the counts of the indictment for which Herring was convicted. The district court interrupted the questioning and asked the attorney, "Does this have one earthly thing to do with the case, Mr. Matthews?" J.A. 874. The attorney responded that the questions were relevant, and the court then told the attorney to proceed. After a lunch break, Herring's attorney resumed the line of questioning. Herring contends that he was prejudiced by the district

14

court's question. According to Herring, the court departed from its role as a neutral party and "etched into the minds of the jurors" that the questions and answers were irrelevant. Brief of Appellants at 51. We find no error.

"[I]n a federal court the judge has the right, and often an obligation, to interrupt the presentations of counsel in order to clarify misunderstandings or otherwise insure that the trial proceeds efficiently and fairly." United States v. Cole, 491 F.2d 1276, 1278 (4th Cir. 1974) (per curiam). While there are, of course, limits to this right, we have no doubt that, in this case, the district court did not abuse its discretion by asking a single question intended to ensure that the jury was presented only with relevant evidence. See United States v. Howard, 115 F.3d 1151, 1156 (4th Cir. 1997) (finding that the district court did not abuse its discretion by questioning the defendant's attorney about the "point" of his statements during opening argument or criticizing the attorney for getting "a little far afield" because the court was merely "seeking to ensure that information presented by counsel in an opening statement was neither misleading nor diversionary").

2.

Paris Hopkins, who had pleaded guilty to unrelated drug and weapons charges and agreed to cooperate with the government as part of his plea agreement, testified that he bought crack cocaine from Miles 10 or 15 times. During cross-examination, counsel for Miles questioned Hopkins about his plea agreement and the potential sentences he was facing, suggesting that Hopkins's cooperation with the government might lead to a reduced sentence. After the United States attorney established on redirect that Hopkins had already been sentenced, counsel for Miles asked, "The question that [the United States attorney] asked about sentencing, you can come back under?" J.A. 1179. When Hopkins answered that he had not been promised anything, counsel for Miles asked, "You haven't been promised anything, but that's what you are trying to do?" J.A. 1179. After Hopkins responded, the district court stated, "Those questions are the dumbest questions in the world." J.A. 1179. Counsel for Miles moved to strike

15

the remark, and counsel for Peterson moved for a mistrial, which the court denied. The court did, however, give a curative instruction.**3**

Miles argues on appeal that the district court erred by denying the mistrial motion. According to Miles, the court departed from its impartial role and prejudicially "imposed upon the jury what the trial judge thought about counse[l]." Brief of Appellants at 43.

Viewing the record as a whole, we are convinced that Miles received a fair trial. See United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988) ("Charges of partiality should be judged not on an isolated comment or two, but on the record as a whole. In the last analysis, litigants are entitled to a fair trial, but not necessarily a perfect or a monochromatic one." (citations omitted)). Therefore, although the statement perhaps was ill-advised, we cannot conclude that this single comment warrants reversal, particularly since a curative instruction was immediately given to the jury. See United States v. Billups, 692 F.2d 320, 327 (4th Cir. 1982) ("[W]e have examined the entire record and conclude that while the court's remarks may have been improvident, they did not deprive Billups of a fair trial before an impartial judge and jury, and that the judge's curative instructions served to assist the jury in giving proper weight to his comments." (citations omitted)); United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994) (per curiam) ("[W]e find that the limiting instruction given by the district court eliminated any danger of the prosecutor's comments prejudicially affecting Francisco's substantial rights so as to deprive her of a fair trial." (footnote omitted)).

D.

Fells and Peterson both were convicted of conspiracy to traffic in cocaine and cocaine base and engaging in a continuing criminal enterprise. They contend, and the government agrees, that the conspiracy convictions must be vacated because the conspiracy served as a predicate offense for the CCE convictions and that convicting them on

_____

**3** The court instructed the jury that "[i]t is improper for me to inject myself in the proceeding. Mr. Payne's questions were proper and I direct you to disregard anything that I may have said or done." J.A. 1184. There was no objection to the curative instruction.

16

both charges is a double jeopardy violation. See Rutledge v. United States, 517 U.S. 292, 300 (1996); United States v. Johnson, 54 F.3d 1150, 1162-63 (4th Cir. 1995). Accordingly, we vacate Fells's and Peterson's conspiracy convictions and sentences.

Peterson also contends that Counts III and IV of the indictment are duplicate charges and that he cannot be convicted on both charges. The government again agrees. Accordingly, we vacate Peterson's conviction and resulting sentence on Count IV of the indictment.

III. SENTENCING ISSUES

A.

Herring, Fells, and Peterson all challenge their sentences on the grounds that the district court erred in determining the quantity of drugs attributable to them for sentencing purposes. [4] Quantities attributable to defendants convicted of conspiracy to distribute illegal drugs are determined by examining "the quantity of[drugs] reasonably foreseeable to each coconspirator within the scope of his agreement." United States v. Irvin, 2 F.3d 72, 78 (4th Cir. 1993). The government must prove the quantity of drugs for which a defendant should be held accountable by a preponderance of the evidence. See United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir. 1993). This court reviews determinations of reasonable foreseeability and drug quantities for clear error. See United States v. Banks, 10 F.3d 1044, 1057 (4th Cir. 1993).

1.

Herring contends that the district court erred when determining the quantity of drugs attributable to him. However, because Herring did not include in the joint appendix the transcript of his sentencing hearing, his challenge is not reviewable. See 4th Cir. R. 30(b) ("In all criminal appeals seeking review of the application of the sentencing

_____

[4] Although Miles initially challenged the determination of the quantity of drugs attributable to him, this Court granted Miles's motion to dismiss his appeal as to that issue.

17

guidelines, appellant shall include the sentencing hearing transcript and the presentence report in the appendix.").

Nonetheless, the record reveals that when sentencing Herring, the district court adopted "the factual findings and guideline application in the presentence report." J.A. 1625. The presentence report ("PSR") attributed 3,290 grams of cocaine base to Herring, yielding a base offense level of 38 under the sentencing guidelines. See United States Sentencing Guidelines Manual § 2D1.1(c)(1) (1995). The only drug-quantity findings in the PSR about which Herring specifically complains are the 1,428-gram finding in paragraph 5 of the PSR and the 100-gram finding in paragraph 6. Even if we deducted those amounts from the quantity attributed to Herring by the district court, 1,762 grams of cocaine base would still be attributable to Herring, a quantity yielding the same base offense level under the guidelines. Any error in attributing the challenged quantities to Herring, therefore, would be harmless. See United States v. Sampson , 140 F.3d 585, 593 (4th Cir. 1998).

2.

Fells and Peterson were convicted of engaging in a continuing criminal enterprise and received life sentences pursuant to section 848(b), which makes a life sentence mandatory for a "principal administrator, organizer, or leader" of a drug-related CCE if the quantities of drugs involved are "at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title." 21 U.S.C.A. § 848(b) (West 1999). The quantities in section 841(b)(1)(B) that are relevant to this case are 500 grams of cocaine powder and 5 grams of cocaine base. Thus, life sentences were proper for Fells and Peterson only if 150 kilograms of cocaine powder or 1.5 kilograms of cocaine base can properly be attributed to them.

(a)

Peterson contends that the district court erred by attributing to him 13.2 kilograms of cocaine base.[5] Peterson argues that the district court

_____

[5] The judgment entered in Peterson's case indicates that the district court adopted the factual findings contained in Peterson's PSR, which

18

erred by adopting the PSR because the PSR relied on statements that were against the weight of evidence presented at trial and on out-of-court statements from co-conspirators that contradicted their trial testimony. Peterson also contends that the PSR included conduct for which he was acquitted by the jury.

When making sentencing determinations, the district court may consider any reliable and relevant information, including hearsay. See United States v. Jones, 31 F.3d 1304, 1316 (4th Cir. 1994); United States v. Bowman, 926 F.2d 380, 381 (4th Cir. 1991). It is clear from the sentencing hearing that the district court relied, at least in part, on its recollection of the trial testimony when determining the quantity of drugs attributable to Peterson. Therefore, even if we treat as unreliable all of the information in the PSR about which Peterson complains, any error in utilizing that information would be harmless as long as the testimony presented at trial supports the district court's quantity determination. See United States v. Johnson, 925 F.2d 1115, 1118 (8th Cir. 1991) (concluding that the district court's error in relying on hearsay contained in the PSR was harmless where the trial testimony supported the district court's findings); see also United States v. Narviz-Guerra, 148 F.3d 530, 537 (5th Cir. 1998).

After reviewing the record, we find sufficient evidence to support the district court's drug-quantity determination as to Peterson. As previously discussed, Antonio Duerson testified that he went on 4 or 5 New York trips and that the group generally obtained 2 kilograms of cocaine each trip. Because Duerson testified that a portion of the drugs obtained in New York was sometimes given to a man named "Bell" in Charlotte, we will assume that the Fayetteville group only received 1 kilogram from each of 4 New York trips. See Sampson, 140 F.3d at 592 ("Where witnesses' estimates of drug amounts are uncertain, however, a district court is well advised to sentence at the

_____

attributed 13.2 kilograms of cocaine base to Peterson. However, during the sentencing hearing, the district court determined only that "there was more than 1.5 kilograms involved in the Steven Peterson case." J.A. 1532. Because 1.5 kilograms is the threshold for the imposition of the mandatory life sentence under section 848(b), whether the district court actually attributed the full 13.2 kilograms to Peterson is largely irrelevant for purposes of this appeal.

19

low end of the range to which the witness testified."). The testimony of Duerson and others established that the drugs from New York were given to Fells, who gave them to Peterson. Once the cocaine powder was converted into cocaine base, Peterson then distributed it among the other members of the group. Thus, a very conservative view of Duerson's testimony places into Peterson's hands the cocaine base derived from 4 kilograms of cocaine powder. This evidence is more than adequate to support the district court's determination that Peterson was responsible for more than 1.5 kilograms of cocaine base.[6] See United States v. Ricco, 52 F.3d 58, 63 (4th Cir. 1995) (approving district court's assumption for sentencing purposes that 100 grams of cocaine powder yields 88 grams of cocaine base).

Peterson's contention that he was sentenced based on conduct occurring during the period for which the jury acquitted him is without merit. While acquitted conduct may be considered when imposing a sentence under the guidelines, it may not be considered when imposing the mandatory sentences established by section 841.[7] See, e.g., United States v. Estrada, 42 F.3d 228, 232 n.4 (4th Cir. 1994) ("[U]nlike the relevant conduct provisions of the sentencing guidelines that permit the court to consider quantities that are not a part of the offense of conviction, the quantity of narcotics attributed to the defendant for purposes of determining the applicability of the mandatory minimum provisions of § 841(b) is based only on specific offense of conviction conduct."). In this case, the jury did not convict

_____

**6** We note that when counsel for Peterson was asked by the district court during sentencing whether he could make an argument to bring the quantity attributable to Peterson below 1.5 kilograms, counsel responded, "I can't say that I could, Your Honor." J.A. 1532. The government contends that this statement amounts to approval by Peterson of the quantity finding, thus rendering his challenge to the finding reviewable only for plain error. Because we have found that any error, plain or otherwise, was harmless, whether we otherwise would have applied the clear error standard of review or the narrower plain error standard is immaterial.

**7** The life sentences in this case were mandated by section 848 rather than section 841. However, because the sentencing portion of section 848 refers to the quantities set out in section 841(b)(1)(B), we will assume for purposes of this discussion that the cases interpreting section 841 are applicable.

20

Peterson for drug activity occurring after October 1993. Duerson, however, was arrested for Chanovan Martin's murder in October 1993. Duerson's testimony implicating Peterson, therefore, did not involve the time period for which the jury acquitted Peterson, and Duerson's testimony can be considered when determining the quantity of drugs attributable to Peterson.

We therefore conclude that the evidence presented at trial was sufficient to support the district court's conclusion that Peterson was responsible for more than 1.5 kilograms of cocaine base. Accordingly, we affirm Peterson's life sentence.

(b)

Fells also contends that the district court erred in determining that more than 1.5 kilograms of cocaine base were attributable to him.[8] Fells contends that the evidence presented at trial established that he supplied only cocaine powder to the group, and that the district court, therefore, erred by converting that powder into cocaine base for purposes of imposing the mandatory life sentence. We disagree.

In United States v. Irvin, 2 F.3d 72 (4th Cir. 1993), this Court held that, when sentencing a defendant to the mandatory minimum sentences provided for in section 841, the district court could not consider the quantity of drugs for which the conspiracy as a whole was responsible. Instead, the court must "determine the quantity of narcotics reasonably foreseeable to each coconspirator within the scope of his agreement." Id. at 78. If that quantity is sufficient to trigger the mandatory minimum sentence under section 841, then the court must impose that sentence "absent a higher sentencing range resulting from the application of the sentencing guidelines." Id.

_____

[8] Fells's PSR held him accountable for 17.8 kilograms of cocaine base. The judgment in Fells's case reveals that the district court adopted the PSR, except that the court declined to consider one of Fells's prior convictions. As noted in the discussion of Peterson's sentence, whether the district court attributed the full 17.8 kilograms to Fells is largely unimportant, given that the mandatory life sentence is triggered by a finding of 1.5 kilograms of cocaine base.

21

In this case, the district court concluded that the cocaine powder supplied to the Fayetteville organization was converted into and distributed as cocaine base. The court based this conclusion on the trial testimony of Andrews, Duerson, and Jordan, all of whom the court found "testified truthfully and accurately." J.A. 1590. The district court determined that a preponderance of the evidence at trial established that "Fells was the mastermind, the chief executive officer of this overall conspiracy. The Court reasonably concludes that he was knowledgeable of all aspects and foresaw all aspects[of the conspiracy]." J.A. 1595.

Fells does not argue that the court erred in determining that the conversion of all the cocaine powder into cocaine base was reasonably foreseeable to him. Moreover, our own review of the record, particularly of Duerson's testimony describing the various trips to New York, reveals more than adequate support for this conclusion.

Fells, however, relying on United States v. Harris, 39 F.3d 1262 (4th Cir. 1994), contends that the district court improperly aggregated the quantities of cocaine powder and cocaine base in order to reach the threshold quantity necessary for the imposition of the life sentence. We disagree. In Harris, the police seized quantities of cocaine powder and cocaine base from the apartment of one of the defendants during the execution of a search warrant. See id. at 1266. Individually, the quantity of neither the cocaine powder nor the cocaine base was sufficient to trigger the mandatory sentences of section 841(b). When sentencing the defendant, however, the district court converted the seized powder into cocaine base and added that to the amount of cocaine base seized. The combined amount was sufficient to trigger the mandatory sentence. Id. at 1271. This court vacated the sentence, concluding that, unlike the Sentencing Guidelines, section 841 "`provides no mechanism for aggregating quantities of different controlled substances to yield a total amount of narcotics.'" Id. at 1271-72 (quoting Irvin, 2 F.3d at 76 n.5). In this case, however, there was no aggregation of different seized controlled substances. Instead, the district court simply concluded that the aim of the conspiracy was to distribute cocaine base and that it was reasonably foreseeable to Fells that the cocaine powder he supplied would be converted into cocaine base for distribution.

22

Accordingly, we affirm Fells's life sentence. See, e.g., United States v. Randall, 171 F.3d 195, 210 (4th Cir. 1999) ("A district court's approximation of the amount of drugs is not clearly erroneous if supported by competent evidence in the record."). Given our disposition of this issue, we need not consider Fells's challenge to the PSR's conversion into cocaine base, rather than cocaine powder, of the money in the stolen safe.

B.

Finally, Fells and Peterson contend that, under Solem v. Helm, 463 U.S. 277 (1983), their life sentences are disproportionate to the offenses committed, thus violating the eighth amendment. We disagree.

In Solem, the Supreme Court held that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." Id. at 290. To determine whether a sentence is proportionate to the crime committed under Solem, the reviewing court must consider: "(1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions." United States v. Kratsas, 45 F.3d 63, 66 (4th Cir. 1995).[9]

Drug trafficking is an extremely serious crime with far-reaching effects. Fells and Peterson were high-level participants in a drug ring that for an extended period of time distributed large quantities of crack cocaine, a highly addictive and destructive drug. Thus, the seriousness of the crime supports a severe sentence. In addition, "a life

_____

[9] In Harmelin v. Michigan, 501 U.S. 957 (1991), the Supreme Court rejected a claim that a mandatory life sentence without parole constituted cruel and unusual punishment for a defendant convicted of possessing more than 650 grams of cocaine. As we noted in Kratsas, the Supreme Court's decision in Harmelin makes it somewhat unclear as to whether Solem's three-part proportionality test should still be applied in noncapital cases. See Kratsas, 45 F.3d at 67. Nonetheless, this Circuit has continued to use the Solem factors in cases involving a sentence of life without the possibility of parole. See id.

23

sentence for a major drug violation is not disproportionate in comparison with other sentences under the Guidelines," United States v. D'Anjou, 16 F.3d 604, 613 (4th Cir. 1994), and states within this circuit impose "similarly severe sentences for narcotics violations of the magnitude involved here." Id. Therefore, after considering the Solem factors, we have no difficulty concluding that the life sentences imposed on Fells and Peterson were not disproportionate to the crimes they committed. See id. ("Life without parole is the second most serious penalty available. Nevertheless, `given that drug dealers themselves sentence many individuals to a lifetime of addiction and dependency, a life sentence for repeatedly dealing drugs cannot be considered disproportionately cruel and unusual.'" (quoting United States v. Meirovitz, 918 F.2d 1376, 1381 (8th Cir. 1990)).

IV. CONCLUSION

Fells's and Peterson's conspiracy convictions and sentences are hereby vacated, as is Peterson's conviction and sentence on Count IV of the indictment. The Appellants' remaining convictions and sentences are hereby affirmed.

AFFIRMED IN PART; VACATED IN PART

24